UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>   v.<br><br>SHAUN HARRISON,<br>   a/k/a "Rev"<br><br>   Defendant | Criminal No. 19-CR-10459-RWZ |

**MEMORANDUM IN SUPPORT OF SENTENCING RECOMMENDATION**

As Justice Christopher Muse of the Massachusetts Superior Court stated when he sentenced the defendant after his trial:

> The defendant's conduct in this case was that of an assassin. He valued [the victim's] life as worthless. One of the detectives described the bullet missing [the victim]'s brain and spine to be a miracle. He, [the victim], has suffered greatly. He will be scarred emotionally and impaired physically for the rest of his life. That, thankfully, he is still alive was not an outcome the defendant desired. The ambushing and shooting of [the victim] was a premeditated plan of first-degree murder by the defendant. He did everything to engrave [the victim]'s name on one of those stones except get a death certificate. He must be sentenced accordingly. The Legislature provides for the imposition of a maximum sentence in circumstances. This is one of them.

See Ex. 2, page 4 (Commonwealth's Resentencing Memorandum). While the government does not ask this Court to impose the maximum potentially punishment (240 months), the recommendation is not far from it.

After proceeding to trial in state court and contesting his culpability in the face of overwhelming evidence, at the Rule 11 in this case the Defendant admitted to shooting the 17-year-old victim at point-blank range:

| | |
|---|---|
| THE COURT: | And did you in particular participate in the events pertaining to the 17-year-old who was shot? |
| THE DEFENDANT: | I did, Your Honor. |

> THE COURT:            Did you shoot -- you shot him?
>
> THE DEFENDANT:        I did, Your Honor.
>
> …
>
> THE COURT:            And is there any question that you in fact were the one who shot this person?
>
> THE DEFENDANT:        I am the one that shot the person, yes.

In sole acknowledgement of the Defendant's acceptance of responsibility in open court, following a contested trial and appeal, and seven years following the incident, the government submits the instant memorandum in support of the joint recommendation for a sentence less than the statutory maximum, specifically, **<u>218 months of incarceration</u>** for the Defendant, Shaun HARRISON, a/k/a "Rev." This parties' joint recommendation of 218 months reflects the extreme seriousness of the offense, the need for deterrence and punishment, and is sufficient but no greater than necessary to accomplish the goals of sentencing.

After unsuccessfully attempting to recruit him into the Latin Kings, this Defendant, who was an academic dean for Boston Public Schools at the time, attempted to murder one of his students in cold blood because he would not join the Latin Kings. As the victim stated in his deposition: "I just feel, like, he tried to kill me for the simple fact that I, you know, didn't want to become a gang member, and I didn't want to follow those -- the track of what he was doing, so he thought that it was just better off to kill me because I knew too much." Ex. 1, p. 132. The victim's courage in resisting the Defendant's effort to recruit him into the Latin Kings was met with a bullet to the back of the head from point-blank range.

It was a miracle that the victim survived. The victim bears the scars of this crime and will carry the infirmities, disabilities, and partial facial paralysis for the rest of his life. The Defendant's acknowledgement of guilt, and the 218-month sentence that he requests this Court

2

to impose is the only reason why the government is not recommending the maximum sentence available.

The government will not discuss the advisory sentencing guidelines, except to say that 218 months is squarely within the applicable guidelines sentencing range. Instead, the government will emphasize the victim's own words from his deposition in a related civil case, and provide this Court with context from his 2015 state court trial.

## ARGUMENT

The Court must consider the factors set forth in 18 U.S.C. § 3553(a) in determining a sentence that is sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in § 3553(a)(2). Among those factors are the "nature and circumstances of the offense," promoting respect for the law, and providing just punishment. See 18 U.S.C. § 3553(a)(2)(A). The sentence must also afford "adequate deterrence" for both the defendant and others. See 18 U.S.C. § 3553(a)(2)(B) (the court may impose a sentence "to afford adequate deterrence to criminal conduct"). Lastly, the sentence must protect the public from the further crimes of the Defendant. See 18 U.S.C. § 3553(a)(2)(C) ("protect the public from further crimes of the defendant"). Consideration of the § 3553(a) factors demonstrates that a sentence of 218 months is sufficient, but not greater than necessary, to meet the goals of sentencing.

I.     NATURE AND CIRCUMSTANCES OF THE OFFENSE

The nature and circumstances of this offense could not be more heinous. The facts here drive the sentence, and the government will place its focus there.

    A.     THE DEFENDANT'S CONDUCT AT SCHOOL

The victim was sophomore in high school when the Defendant tried to murder him. He was living with his grandmother. The victim came from a difficult home life and was assigned

to work with the Defendant.  See Ex. 1, p. 31-32, 36-37 The Defendant was an Academic Dean – a "head honcho" with "a lot of authority," in the victim's school. Ex. 1. 51-52. The Defendant was supposed to be someone with experience helping address "gun violence", working with the Department of Youth Services and Boston Police. See Ex. 1, pp. 49-50.  According to the victim, the Defendant was always in the hallways, like a hall monitor. He would sit with the students at breakfast. And when classes were in session, he would have "counseling sessions" with certain kids who were freshmen. See Ex. 1, pp. 48-53. In actuality, the Defendant did little in the way of counseling, had no intention of addressing gun violence and delivered his own education.

The Defendant's methods were clever and subtle. He would meet his "students" for breakfast and make introductions there.  See Ex. 1, pp. 37-45. Identifying students who were at-risk, the school would the send them -- including the victim -- to the Defendant for "counseling" when disciplinary issues arose.  See Ex. 1, p. 44-46.  These counseling sessions with the Defendant, were "mandatory" and the victim had no choice but to meet with the Defendant.  Ex. 1, p. 59.  The Boston Public School in fact required the victim to meet with his would-be murderer during the school day.

The victim enjoyed the sessions at first. He would be permitted to skip classes and come see the Defendant, who would have sandwiches and snacks that students could not otherwise buy. Ex. 1, p. 60-61.  However, the only counseling the Defendant did was to recruit the victim to sell drugs to other high school students. During one of their first meetings, the Defendant saw something on the victim's phone related to marijuana and asked if the victim wanted to make some money. See Ex. 1, 75-76. The victim agreed, and they exchanged numbers, and met afterschool. The Defendant brought the victim over his house and gave him weed to sell.

Once he was selling for the Defendant, as the victim explained, their conversations had

nothing to do with school. "When [the victim] started selling drugs for [the Defendant], that's all [they] talked about." Ex. 1, pp. 56. The Defendant would direct the victim to sell to certain students in the school building or send him to complete deals that had already been arranged in the school building. See Ex. 1, 92-94 ("He would even actually tell me to go to, like, different people in the school to sell to them." "Or he would just be telling me that some -- to go up to a floor and there'd be somebody waiting for me there."). Soon, the Defendant had turned the high school into a lucrative place to deal drugs; there was a premium for drugs sold at the high school itself. See Ex. 1, p. 94 ("I would make more on campus."). The Defendant was a greedy dealer, and the victim would argue about profits with his 60-year-old boss. See Ex. 1, 69-74.[1]

The Defendant also told the victim that "he was a part of the Latin Kings gang." Ex. 1, p. 54.[2] While at the Defendant's apartment, the victim then saw the Defendant's Latin Kings murals and paraphernalia: "a big lion" and gang "signs" and symbols, in his apartment. See Ex. 1, pp. 64-75. The Defendant also brought the victim to a Latin Kings meeting. The Defendant was "teaching [the gathered Latin Kings] how to kill people, and all this shit." Ex. 1, pp. 84-85. Another student "asked [the Defendant] how many times he's killed, and he didn't say nothing with his mouth, but had a gesture with his hand, and he said, like, about seven people." Ex. p. 85. The Defendant continued to try and recruit the victim into the Latin Kings, and the victim resisted. The Defendant told the victim,

> Listen, you know, you won't have anything to worry about. Like, anybody you have problems with, you know, I'll take care of it, you know, me and my homies

---

[1] If it was not about drugs, the Defendant would only otherwise "talk about how he hasn't gotten laid," or would "ask [the victim] if [he] knew any girls that would, pretty much, have sex with him, [or] with [the victim] and [the Defendant] together." Ex. 1, pp. 53-56.

[2] The Defendant explained on one occasion that he had been beaten by other Latin Kings the night before in a manner consistent with a head-to-toe punishment that the gang would inflict for violation of the manifesto. See Ex. 1, pp. 64-66.

> will take care of it, you know. All you got to do is be down with this initiation, and stuff like that.

Ex. 1, p. 84-87.  The victim rebuffed the Defendant's efforts to recruit him.  As the victim told the Defendant, "I don't want to do none of that. I told you, I'm just about my money, and that's it." Ex. 1, p. 86.

### B.   THE ATTEMPTED MURDER

The victim's refusal to join the Latin Kings, and a dispute over the drug money led to tension. This tension led to the Defendant orchestrating a beating of the victim by another student in the high school on the morning of the attempted murder.  See Ex. 2 ("On the morning of Marth 3, 2015, the defendant directed another student [to] attack the victim at school.").  As the state prosecutor described of the trial testimony, "[n]ot satisfied with that physical assault, the defendant decided to murder the victim in the isolated industrial area near his house. So emboldened with his position of power over his students that sold drugs for him, the defendant even told another student he was going to do it."  Ex. 2, p. 1.

The shooting itself was captured on video. The Defendant can be seen walking behind the victim down a narrow-shoveled sidewalk. The Defendant raises his arm and the victim falls. The victim had no idea this was coming and was completely unaware that the school official walking behind would try and murder him in cold blood. The Defendant walked away and would go into school the next day.  Business as usual.

Boston Police then investigated the attempted murder. The Defendant spoke with law enforcement and coolly denied any involvement in the fact of specific questions.  That is, until he was informed that the victim survived.  He then asked for counsel. The Defendant's actions merit no further discussion.  This was a monstrous crime.

The victim's courage after the shooting, and his words describing his miraculous

recovery, however, are worth reciting verbatim:

> It took me five seconds to get up. I got up. I was really, really dizzy. It was really loud. I heard that ringing in my ears. And I just said -- you know, I just said, "Bro, what happened? Bro, what happened"? I was, like, "Oh, gee, what happened?" And I looked around, and he was nowhere to be found. And I didn't know what was going on, and I -- that's when I just, like, started walking. I was going to go home, actually. I thought somebody knocked me out.
>
> And when I started walking, I just -- first, when I tried to talk to myself, my jaw dropped, and then I started bleeding. I felt, like, the warm sensation going down my back, and then down my -- down the front side of my chest, and I knew that something was bad because I was bleeding a lot, you know.
>
> I was just -- I, you know, I didn't panic. I, like, stuck my fingers inside the bullet wound to block -- you know, put pressure on it. And that's when I -- a car came, and I told myself, "If I don't die from whatever's going on with me, you know, I'm going to just jump into the car to get help."
>
> I was, like -- so I jumped in front of his car, and the -- like, I told him -- I said, "I -- actually, I don't know what happened to me. I think I was" -- I thought I got stabbed -- "I think I got shot."
>
> And that's when they said, "You – I think you got shot." And he told me to calm down, because, at that point, I just started telling him I didn't want to die. I asked him -- told him I didn't want to die, I didn't want to die. And -- that's really hard for me, but I just, like, I -- I -- I -- I...
>
> And he said to me that -- asked me if I had anything on me personally that the cops were going to, like -- you know, anything that was going to -- to, like, pretty much get me in trouble with the cops. I said, "I have a pocket knife in my hand," or whatever. And, you know, so I threw it to the curb and sat on the snowbank, and that's when the ambulance came.
>
> And when the ambulance came, the guy -- the paramedic came, rushed toward me, and I was just, like, "What happened?" And then he, like, looked at me, and he was, like -- he said – these were his exact words. I'll never forget 'em – he said, "What the fuck, kid. How are you even talking to me right now?
>
> And, you know, I said, "What do you mean?" And he was, like, "Kid, you got a gunshot wound to the back of your head. How are you talking to me now?" And, like -- I was, like, "I don't know, man."
>
> And then they, like, put me in the ambulance, and they brought me to Boston Medical. It was, like, not even two minutes away from there. And that's when, you know, they rushed me into the hospital. And the detective, he was, like,

asking me a whole bunch of questions, this and that. But I was -- I was losing too much blood, blood was gushing out of my ear. And when that happens, they said that usually the person ends up dying. They don't even see that in a person who is living.

And I was in denial. I didn't know what had happened, you know. I put my trust into that guy so much, you know what I mean? Like, he was supposed to help me, you know, and I trusted him. I thought that he was going to, you know, help me out. And, you know, like, for him to know everything that I went through, and, like, you know, just to try to just kill a harmless life, I just -- I was in denial.

And then, like, my grandmother and my aunt, like, came to the room, and they were asking me what happened. Nobody wanted to tell them what was going on. So I told them. I said, "I got shot." And they said, like, "What do you mean?" And my grandmother fainted.

And then I said, "I just got shot."  And she said, "Where?" And I said, "The back of my head," and that's when she fainted again. And I just said -- she came up to me and tried touching my legs and stuff to make sure I was good. I was like, "I'm not paralyzed." You know, like, I could feel my legs. I said, "I'm all right."

And that's when the doctor came in.  And he looked at me, and he looked at everybody in the room and said, "You know, kid, I don't understand how you're alive right now. It's medically and scientifically impossible for you to be alive right now."

And -- that wasn't the exact moment, it was a couple of hours later, actually, after they seen what was wrong with me. And he said that the bullet missed my brain stem and carotid artery by 2 centimeters, and that he had never seen something like that in the whole time he's been a doctor. And then that's when they gave me the option of surgery and stuff.

I had a broken jaw, you know, half my face was paralyzed. I have really bad neuropathy on my neck. They did two major surgeries on me. But I -- it took me 12 days in the hospital. I, pretty much, recovered after that, but it was a long -- it was, like, a nine-month to ten-month recovery. I had my mouth wired shut for nine months. I had -- yeah, that was, pretty much, like, what I had.

And then I had to go, a couple of times, to get -- because I lost 50 percent of my hearing, but I wanted to, like, in January, to see what's up with my hearing, to see if I needed a hearing aid in. But by the grace of God, I got all my hearing back.

…

I mean, everybody just working on me, emergency, like, you know, everybody stopped what they were doing. I was losing a lot of blood. I remember that. All I

8

>remember is them working on me right away, you know.  The next thing I know, they're giving me some type of medications. I woke up the next day, in the afternoon, and that's when they told me the severity of my wounds. And that's when they kept telling me how miraculously -- how I'm alive, how, you know, they've never seen that in all the things that they've done.

Ex. 1, p. 125-132.

Though the victim was never a member of the Latin Kings, the Defendant was successful in recruiting a number of other teenagers who would become members.  The Defendant called upon these other students to assist him in concealing evidence of the attempted murder and hiding evidence. As the government noted at the Rule 11 hearing:

>At around 4:02 p.m. on the day after the shooting the defendant sent a text message to a recipient named King D block that read, quote, "get out house." Around the time that that message was sent to King D Block, a police officer observed three men leaving the defendant's apartment building with backpacks. At this point the police had begun to identify the defendant as being responsible for the attempted murder.
>
>Concerned that these individuals were removing evidence, namely weapons used in the shooting, from the defendant's apartment, the officers stopped these three individuals. They were ultimately identified to be Wilson Peguero, Dante Lara, Oscar Pena, all co-defendants charged in this case with RICO conspiracy. During a search of those individuals, officers recovered two handguns, clear bags containing marijuana and four cell phones. One of the cell phones had the same number as King D Block from the defendant's phone.

See ECF #2695, p. 30-31.  These three teenagers, W. PEGUERO, LARA, and PENA, would go onto become full members of the Latin Kings.  Wilson Peguero, a/k/a "King Dubb", would in fact serve as Inca of the D5K Chapter. These three young men would then later be indicted along with HARRISON, their former high school dean, as part of this case.

### C. THE VICTIM'S LIFE TODAY

The victim suffered lasting injuries and partial facial paralysis.  The victim described his injuries as follows:

>I got neuropathy in my face and in my neck.  I still have the bullet in my head,

> actually, so I get really bad headaches. And when it gets cold, it really hurts.
>
> Just -- that's pretty much it. And being half paralyzed in my face, and having to have -- I have -- (indiscernible) A metal weight. I got a metal weight on top of my eyelids so I can open and close my eyes. But it gets dried up sometimes so, you know, it's not -- it's not a fun time.

Ex. 1, p. 135-138.

In a decision in a related civil case (Rodriguez, v. Harrison, et. al., Civ. No. 19-10116), Judge Sorokin described the victim's injuries as follows:

> Miraculously, Rodriguez survived through a combination of gritty determination—he plugged the hole in his head with his fingers to stanch the bleeding till a passerby stopped—and good fortune—the bullet missed his brain stem and carotid artery by two centimeters. Id. at 126- 29. All has not been easy though for Rodriguez. He endured two surgeries, spending twelve days in the hospital. Id. at 129. The bullet shattered his jaw, which doctors wired shut for nine months. Id. at 129-30. He remains paralyzed on half of his face, suffers from neuropathy in his neck and face, has had hearing loss, and requires weights on his eye lids to aid in opening and shutting his eyes. Id. at 130, 137-38. The bullet remains lodged in his head causing headaches as well as pain in cold weather. Id. at 137. This is to say nothing of the emotional distress that Rodriguez has endured since the shooting. Rodriguez understandably suffers from posttraumatic stress disorder ("PTSD"), which makes it difficult for him to keep a steady job. Id. at 23-25. After he was prescribed narcotics during his treatment at Boston Medical Center, Rodriguez developed an opiate addiction with which he continues to struggle.

Rodriguez, v. Harrison, et. al., Civ. No. 19-10116, ECF #81 (D. Mass. Aug. 5, 2022) (Sorokin, J.).

## II.  REFLECT THE SERIOUSNESS OF THE OFFENSE, PROMOTE RESPECT FOR THE LAW, AND TO PROVIDE JUST PUNISHMENT FOR THE OFFENSE

Given the outrageous nature of the crime, the Court must ensure that the sentence reflects the seriousness offense.  In short, while employed by an urban school district, the Defendant utilized a public high school as a venue to recruit at-risk youth into a violent criminal enterprise. The very thing he was hired to work against.  The Defendant then used the students of this public high school to sell drugs to other high school students, at his direction, and for his own profit.

Then, when one student refused to join the violent criminal enterprise, the Defendant tried to execute the student, in cold blood.  The Defendant was the architect of ruin for an entire generation of young lives at that high school.  The only circumstances that could be more serious is if the Defendant had been successful and murdered his wayward recruit. This Court must impose a sentence that reflects the seriousness of these crimes, and 218-months is the proper means to do so.

An 18-year sentence also promotes respect for the law.  This Defendant has certainly earned a lengthy sentence. This Court must ensure that respect for the law is promoted by imposing a serious and lengthy sentence for such flagrant and unacceptable crimes.

Just punishment for this Defendant must also be considered. Surveying the Defendant's crimes as a whole, there is no doubt that the Defendant is a violent and dangerous individual, whose indoctrination of young men in high school destroyed any possibility of them to escape gang life.  In this context, just punishment must send a message to those victimized by the Defendant and the Latin Kings, directly and indirectly.  The law cannot, should and will not abide this brand of corruption of public institutions, or their use as platforms for recruitment into a criminal enterprise that specializes in street terrorism.  Just punishment must reflect a sentence that is equal to the Defendant's serious, deadly, and destructive crimes. A sentence of 218-months, in this context, sends the proper message and would reflect the seriousness of the offense, promote respect for the law, and provide just punishment.

### III.     DETERRENCE AND PROPORTIONALITY

In this case, general deterrence takes on a very significant role, and must be considered carefully.  This Court should be mindful of the message sent to offenders who would seek to target minors, recruit members, or use their positions in public institutions to further this violent

11

organization.

In other sentencings, the government referenced how juveniles would be recruited into the Latin Kings in high schools. This Defendant was doing just that. When sentencing this Defendant in Superior Court, Judge Muse suggested that schools should be sanctuaries. The Defendant saw things otherwise. This Court must send a message of general deterrence that is clear and direct: society will not accept the Latin Kings committing crimes in communities, targeting anyone or infiltrating a public school or any other institution. Society and the law will not accept any such power or position to be wielded on behalf of a criminal organization. A 218-month sentence imposed without litigation, in the context of a prompt guilty plea, and admission of factual guilt, sends this extremely clear message to those that would degrade their community and its sense of safety.

Specific deterrence to this Defendant individually would also be well served by a 218-month sentence. The Defendant is older, and will likely exit prison at an advanced age. He must be deterred from ever contemplating a return to gang life.

## IV.  PUBLIC PROTECTION

As a final factor, the Court must protect the public from hyper-violent, drug dealing offenders such as this Defendant, who recruit children into violent criminal organizations. This Defendant's crimes are the stuff of nightmares. If anything, the government has concern that the sentence permissible under federal law does not adequately punish the Defendant.. By comparison to any conditions of supervised release or parole, this Court can be assured that only incarceration will protect the public from the Defendant. Given the attempted murder and, the brazen sense of impunity he exhibited during his recruitment efforts and following this crime, incarceration is the only option to ensure public safety. A 218-month sentence is the proper

means to accomplish all these goals of sentencing.

## CONCLUSION

Due to the nature and circumstances of the crime, and because deterrence (both general and specific), respect for the law, and just punishment are all critical sentencing factors for this Defendant, the Court should impose a sentence of 218 months.

Respectfully submitted,

RACHAEL S. ROLLINS
United States Attorney

By:

*/s/ Philip A. Mallard*
PHILIP A. MALLARD
Assistant U.S. Attorney
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston MA 02210
617-748-3674

### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Philip A. Mallard*
PHILIP A. MALLARD
Date:  May 1, 2023                Assistant U.S. Attorney

13